# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THOMAS J. GORBY, | ) Civil Action No. 2: 12-cv-1170 |
| Petitioner, | ) |
| v. | ) |
| JOHN WETZEL, Secretary Pennsylvania Department of Corrections, DISTRICT ATTORNEY OF WASHINGTON COUNTY, PENNSYLVANIA, and JAY LANE, Superintendent of the State Correctional Institution at Fayette,[1] | ) |
| Respondents. | ) |

## MEMORANDUM OPINION

**CONTI, Chief District Judge**.

## I. Introduction

Presently before the court is the counseled petition for writ of habeas corpus filed on behalf of Thomas J. Gorby, also known as Jeff Gorby ("Gorby" or "petitioner"), pursuant to 28 U.S.C. § 2254. (ECF No. 2). Gorby is challenging his 1986 conviction for first-degree murder in the Court of Common Pleas of Washington County, Pennsylvania. The magistrate judge to whom the case was referred issued a report and recommendation ("R&R") in accordance with 28 U.S.C. § 636(b)(1)(B), which recommended that both the petition and a certificate of appealability be denied. (ECF No. 42.) Gorby filed objections to the R&R arguing that

---

[1] Records of the Pennsylvania Department of Corrections state that Petitioner Thomas J. Gorby is currently incarcerated at SCI-Fayette, http://inmatelocator.cor.pa.gov/#/, and the warden of this institution is Jay Lane, http://www.cor.pa.gov/Facilities/StatePrisons/Pages/Fayette.aspx#.V9V3053D_OE (last visited September 28, 2016). Therefore, in accordance with Rule 2(a) of the Rules Governing 2254 Cases and Fed.R.Civ.P. 25(d), the caption is updated accordingly.

counsel's failure to present a diminished capacity defense at trial resulted from counsel's unreasonably limited investigation and he was, accordingly, ineffective. (ECF No. 48.)

Where, as here, objections have been filed, the court is required to make a <u>de novo</u> determination about those portions of the R&R to which objections were made. <u>See</u> 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b). The court may accept, reject, or modify the recommended disposition, as well as receive further evidence or return the matter to the magistrate judge with instructions. After reviewing <u>de novo</u> the record in this case, including Gorby's objections to the R&R (ECF No. 48), his supplement to the objections (ECF No. 57), Respondents' reply (ECF No. 60), the arguments of counsel presented at the January 19, 2016 status conference, the evidence presented at the hearing on September 7, 2016, and the supplemental briefing submitted by the parties (ECF Nos. 80, 81), the court disagrees with the magistrate judge's ultimate conclusion that Gorby is not entitled to habeas relief. Therefore, the court declines to adopt the R&R as the opinion of the court. For the reasons that follow, the court will sustain Gorby's objections and issue a conditional writ of habeas corpus obligating the Commonwealth to either release Gorby or retry him within 120 days.

## II. Procedural and Background History

A.    <u>Trial and Direct Appeal</u>

On September 17, 1986, a jury empaneled by the Court of Common Pleas of Washington County, Pennsylvania, found Gorby guilty of first-degree murder in the death of Drayton Sphar ("Sphar"). The jury also found Gorby guilty of robbery for having taken Spahr's belongings including, <u>inter alia</u>, his wallet, money, and belt during the course of the killing. (The robbery conviction is not being challenged in this case.) The Commonwealth presented overwhelming

evidence establishing that Gorby had committed the murder and robbery. The Pennsylvania

Supreme Court summarized the trial evidence as follows:

> On Friday, December 20, 1985, James Yeager, a friend of the victim, Drayton Sphar, telephoned Sphar and asked Sphar to pick him up at the Old Trails Inn. Spahr arrived at the Old Trails Inn at approximately 10:00 p.m. that evening. Also present that evening at the Old Trails Inn was the appellant, Thomas Gorby.

> When he arrived, Sphar was wearing a leather jacket and a chain belt with a buckle which bore his name on the back. He was also carrying a wallet which was embossed with a Harley Davidson emblem. While there, he bought several drinks for Yeager and [Gorby]. He also bought at least one round of drinks for the entire bar that evening. Each time he bought drinks, the victim displayed a large roll of bills which was particularly visible to Yeager and Gorby who were seated next to him.

> After a couple hours passed, [Gorby] asked the victim to give him a ride to the Somerset Inn so that [Gorby] could retrieve his car which was supposedly parked in the Somerset Inn's parking lot. The Somerset Inn is located approximately six miles from the Old Trails Inn. Gorby and the victim left the Old Trails Inn somewhere between midnight and 12:30 a.m. on December 21, 1985, in Sphar's 1976 dark green, Mercury Marquis. Upon leaving, the victim assured Yeager that he would return to drive Yeager home.

> At approximately 1:00 a.m. that morning, [Gorby] arrived at the Somerset Inn bar alone. Shortly after arriving, [Gorby] bought a round of drinks for everyone in the bar. He then went into the rest room and after returning, bought another round of drinks for everyone and wanted to again buy everyone a drink about ten minutes later. Each time he bought drinks, he displayed a roll of bills.

> While at the Somerset Inn, [Gorby] pulled a belt out of his pants similar to the one the victim was wearing earlier that evening. He placed the belt on the bar and it was passed among several of the patrons. Next, [Gorby] gave the bartender, Harold Cain, a wallet which matched the description of the victim's wallet. Very soon thereafter, he displayed a knife stating that he wanted to show Cain how sharp it was and began shaving Cain's arm. Cain testified that while [Gorby] was shaving the hair on his arm, he noticed blood stains on the knife.

> [Gorby] remained at the Somerset Inn until closing, whereupon he asked Cain if Cain could drive him to the Old Trails Inn. Cain dropped [Gorby] at the Old Trails Inn between 2:30 and 3:00 a.m. on December 21, 1985. Before leaving the Somerset Inn, Cain noticed Drayton Sphar's vehicle parked in the lot.

3

When [Gorby] returned to the Old Trails Inn, he again purchased drinks for all the patrons. At that time, [Gorby] was wearing the belt, which was later identified as belonging to the victim, wrapped around his hand. While there, [Gorby] played pool with Nanette Leeper. Leeper noticed dried blood stains on [Gorby's] pants and when she questioned him as to those stains, he told her that he had been gutting deer earlier that day. [Gorby] and Leeper left the Old Trails Inn around 4:00 a.m. Leeper last saw [Gorby] when she dropped him off at the Eighty-Four Truck Stop shortly after 4:00 a.m. on December 21, 1985.

[Gorby's] girlfriend, Susan Loveland, testified that [Gorby] called her on Friday, December 20, 1985 and asked her if she had any money. That same day, at approximately 3:00 p.m., she drove [Gorby] to the Old Trails Inn and gave him $20.00. She did not see [Gorby] again until 4:30 p.m., Saturday, December 21, 1985 when she met him and his mother at the corner of LeMoyne and Lockhart Streets, in Washington, Pennsylvania. [Gorby's] mother drove Loveland and [Gorby] to the Howard Johnson Motor Lodge where a room was registered in Susan Loveland's name. It was in this room that [Gorby] confessed to Loveland to killing Drayton Sphar. [Gorby] told Loveland that he had stabbed Sphar and then slit his throat with a knife. He told her that the killing occurred in the Somerset Inn parking lot in Sphar's car. He also told Loveland that he had taken money from Spahr. In addition, Loveland testified that [Gorby] had Sphar's leather jacket and his belt in the room. Later in the evening, [Gorby] placed the victim's wallet, belt and leather jacket as well as a wash cloth and one glove in a pillow case and disposed of the pillow case in a trash can located on the premises of the Howard Johnson Motor Lodge.

On Monday, December 23, 1985, John Logar, an employee of the Howard Johnson Motor Lodge, found, while emptying the trash, a pillow case containing a leather jacket, a wallet, a lighter, a belt, a pair of gloves and a wash cloth. Logar testified that after finding the belt, he tried it on and noticed that the name Drayton Sphar was embossed on the back of the buckle. Because Logar had just read in the newspaper about the murder of Drayton Sphar prior to finding the pillow case, he called the County Coroner.

Pursuant to their investigation, members of the Pennsylvania State Police questioned [Gorby] at the home of his mother, Mrs. Betty Stevens on December 22, 1985. On December 23, 1985, the police filed a Criminal Complaint against [Gorby] and attempted to serve him with an arrest warrant at his mother's home. When they arrived, Mrs. Stevens informed them that [Gorby] had left her home shortly after being questioned on December 22, and that she had not seen him since.

> After an extensive search, [Gorby] was finally located in Houston, Texas, following his arrest there under an assumed name. [Gorby] waived extradition and returned to Pennsylvania on April 24, 1986.

Commonwealth v. Gorby, 588 A.2d 902, 904-06 (Pa. 1991) ("Gorby-1").

Gorby was sentenced to death on the first-degree murder conviction and a consecutive term of eight to sixteen years of imprisonment on the robbery conviction. Gorby was represented at trial by retained counsel Daniel L. Chunko, Esquire ("Chunko"). After trial, Attorney Chunko was permitted to withdraw and John Lieker, Esquire, the Public Defender of Washington County, represented Gorby on his post-trial motions and direct appeal.

Gorby filed a direct appeal to the Pennsylvania Supreme Court, which affirmed both the convictions for first-degree murder and robbery, as well as the imposition of the death penalty.

B.      State Court Collateral Challenges

On January 10, 1996, Gorby filed a pro se post-conviction relief petition pursuant to the Post-Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. § 9541-9546, which began a ten-year odyssey of PCRA proceedings and appeals to the Pennsylvania Supreme Court with two remands back to the PCRA court for further development of the record. The PCRA court appointed Christopher L. Blackwell, Esquire, to represent Gorby with leave to file an amended PCRA petition. After the granting of several continuances and requests to extend time for filing the amended PCRA petition, Attorney Blackwell, with the assistance of the federal Defender Association of Philadelphia, Capital Habeas Corpus Unit, filed on May 30, 1997, a 188-page amended petition, raising twenty-two claims for relief. The Commonwealth filed an answer on September 28, 1999, and in response, on November 3, 1999, Gorby filed seventeen affidavits of proposed witnesses in support of his amended PCRA petition.

The PCRA court determined that a hearing on the merits was necessary only with respect to what trial counsel, Daniel L. Chunko, "knew or should have known of the Petitioner's mental health status at the time of trial." Commonwealth v. Gorby, No. 555(a)(b) 1986, slip op. at 3 (C.P. Washington April 19, 2000) ("PCRA Opinion") (ECF No. 31). On January 19, 2000, the PRCA court held an evidentiary hearing and allowed Gorby to present his trial counsel as a witness and admitted other witness declaration-affidavits and records "for the limited purpose of a proffer as to what the various affiants would testify if called to do so." PCRA Opinion, at 4, n.4. On April 18, 2000, the PCRA court denied relief on all twenty-two claims.

Gorby appealed and on December 31, 2001, the Pennsylvania Supreme Court affirmed the denial of relief on all claims except the claim that trial counsel was ineffective at capital sentencing for failing to reasonably investigate, develop, and present mitigating evidence. Commonwealth v. Gorby, 787 A.2d 367 (Pa. 2001) ("Gorby-II"). The case was remanded for an evidentiary hearing on the ineffectiveness of counsel during the penalty-phase of the trial.[2]

On remand, the PCRA court conducted hearings on April 2 and 3, 2002, on the issues of Gorby's mental history and capacity and trial counsel's failure to investigate mitigating evidence. The PCRA court limited the presentation to mental-health evidence, and did not allow Gorby to develop a record with regard to broader social-history evidence. Testimony was adduced from psychiatrist, Dr. Robert C. Fox, Jr., and two psychologists, Harry D. Krop and

---

[2]     On many claims, including the claim presented in the instant federal habeas petition, the Pennsylvania Supreme Court was fractured and a majority of the justices did not endorse a single rationale for denying the claims. The case was remanded for factual development of the ineffectiveness claim centered only on the absence of mental-health mitigation. The parties agree that the AEDPA deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and the standard of review for this court is de novo.

6

Jethro W. Toomer, whose testimony is summarized by the Pennsylvania Supreme Court as

follows:

> All three mental health professionals confirmed that, after examinations and
> testing of Gorby, they each determined that he suffers (and suffered at the
> time of the offense) from cognitive disorder, other major mental health
> conditions, and the effects of substantial and prolonged childhood abuse,
> impacting on his thinking and conduct, and implicating the mitigating
> circumstances . . . of the death penalty statute, 42 Pa.C.S. § 9711(e)(2), (e)(3),
> (e)(8).  Although the expert witnesses generally testified that the etiology of the
> asserted cognitive disorder was difficult to determine, they emphasized that there
> were "red flags" present in Appellant's medical and social history, including his
> irrational behavior at the time of the offense, [ ], head injury involving a
> fracturing of the portion of the skull adjacent to the left frontal lobe of the brain
> [ ], maltreatment during his childhood as evidenced by his life-history
> declarations and medical records indicating, inter alia, malnutrition, dehydration,
> and abandonment; incidence of high fever [ ]; alcoholism and poly-substance
> abuse, [ ], dysfunctional and abuse family situation, [ ]; relatively high
> intelligence as distinguished from poor educational performance, [ ] and
> consistently poor decision making.
>
> The professionals also testified that it is not unusual for people with mental-health
> issues to lack self-recognition, [], nor is it unusual for persons involved in abusive
> family situations to demonstrate reluctance to discuss the abuse – in these regards
> and others, they emphasized the essential role of collateral data in the form of
> medical, mental-health, and social-history records in making an informed
> assessment concerning an individual's mental-health makeup. . . . According to
> the expert witnesses, the life-history records that were assembled at the post-
> conviction stage closely correlated with the results of neuropsychological testing
> and evaluations.  Further, the witnesses specifically testified that the facts that
> were known to trial counsel, even when considered in the generalized manner in
> which he discussed them, presented "clear indicia of serious emotional problems."

Commonwealth v. Gorby, 909 A.2d 775, 786-790 (Pa. 2006) ("Gorby-III") (internal citations to

the record omitted).

The PCRA court again denied relief and Gorby again appealed.  Commonwealth v.

Gorby, No. 555(a)(b) 1986, slip op. (C.P. Washington May 23, 2002) (ECF No. 31). On March

22, 2004, the Pennsylvania Supreme Court remanded the matter for further development of

Gorby's claim that direct appeal counsel was ineffective for failing to raise trial counsel's ineffectiveness.

Upon remand, the PCRA Court held an evidentiary hearing on October 15, 2004. Gorby was unable to question his direct appeal counsel as that attorney had died during the course of the litigation. Gorby did present testimony from two attorneys with substantial defense experience in capital litigation who both "opined that Appellant's claim of ineffective assistance of trial counsel at the penalty phase of trial was strong and apparent from the record." Gorby-III, 909 A.2d at 788. Both attorney-witnesses testified that, based on circumstances actually known to trial counsel, additional investigation into Gorby's mental health condition was warranted. The PCRA court did not issue a subsequent opinion, as one was not required under the remand order.

On June 20, 2006, the Pennsylvania Supreme Court vacated Gorby's death sentence, finding that counsel was ineffective during the penalty phase of trial and that appellate counsel was ineffective for failing to raise trial counsel's ineffectiveness. The court found that trial counsel failed to reasonably investigate Gorby's case by "inappropriately limit[ing] his investigation to the acquisition of rudimentary information from a narrow set of sources." Gorby-III, 909 A.2d at 790-91. The court found that Gorby was prejudiced at capital sentencing by counsel's failure to reasonably investigate. Id.

The Commonwealth declined to seek the death penalty on resentencing, and agreed that Gorby should be sentenced to life imprisonment. On August 24, 2011, almost twenty-five years after his conviction, Gorby was resentenced to the mandatory sentence of life in prison on his conviction for first-degree murder.

C.     Federal Habeas Proceedings

Gorby filed the instant counseled petition for writ of habeas corpus on August 21, 2012. He raises a single claim in support of his request for federal habeas relief; specifically, that trial counsel was ineffective for failing to reasonably investigate, develop, and present a diminished capacity defense that complemented the voluntary intoxication defense upon which the jury was instructed at trial. Gorby argues that had his trial counsel conducted a reasonable investigation into diminished capacity, he would have obtained and presented expert testimony, such as that proffered in the PCRA proceedings, that supports that kind of defense.

Following briefing by the parties, the magistrate judge recommended that the petition be denied and that no certificate of appealability be issued as Gorby had not met the deficient performance prong of Strickland v. Washington, 466 U.S. 668 (1984).  (ECF No. 42.)  The report contained no recommendation regarding the prejudice prong of the ineffectiveness claim. Gorby filed objections to the report and recommendations. (ECF No. 48.)

This court's review of the report and recommendation is de novo.  The court scheduled a status conference to discuss whether an evidentiary hearing or supplemental briefing was needed on the following issues:

> 1.  In light of the prevailing professional norms in 1985, was counsel's failure to pursue or further investigate the potential for the limited defense of diminished capacity unreasonable?;
>
> 2.  Under those norms, was counsel's failure to discuss with Gorby the potential for the limited defense of diminished capacity before trial unreasonable?;
>
> 3.  Would a defendant at trial be able to pursue a diminished capacity defense as well as the defense of actual innocence?; and
>
> 4.  Was Petitioner prejudiced by counsel's failure to discuss with him the potential diminished capacity defense.

Order of November 20, 2015 (ECF No. 51).  A status conference was held on January 19, 2016, and,  at the conclusion, the court made a preliminary determination that trial counsel's conduct during the guilt phase of trial fell below an objective standard of reasonableness under the first prong of Strickland, due to counsel's failure to investigate evidence of Gorby's diminished capacity in light of the facts that were known to him at the time. HT 1/19/16 (ECF No. 61) at 23. The court ordered the parties to submit supplemental briefing on the issue of prejudice.  The parties filed their respective supplemental briefs (ECF Nos. 57, 60) and both parties requested an evidentiary hearing to further develop the record.  The court agreed that in order to make a determination with respect to the second prong of Strickland, the current record must be supplemented on the limited issue of whether Gorby was prejudiced by his trial counsel's deficient performance.

On September 7, 2016, the court held an evidentiary hearing at which Gorby and Chunko, his trial counsel, testified.  The parties were permitted to file supplemental briefs with respect to the prejudice issue.  On September 21, 2016, the parties each filed a timely supplemental brief with the court.  (ECF Nos. 80, 81.)

      1.     Evidentiary Hearing on September 7, 2016

Section 2243 of Title 28, United States Code, provides that "[u]nless the application for the writ and the return present only issues of law the person to whom the writ is directed shall be required to produce  at the hearing the body of the person detained."  28 U.S.C. § 2243 (para. 5). The Supreme Court of the United States has held that when a person is in state custody it is the responsibility of the state custodian to produce the prisoner before a federal court when directed to do so.  See Penn. Bureau of Correction v. U.S. Marshals Svc., 474 U.S. 34 (1985).

Although the court issued a Writ of Habeas Corpus Ad Testificandum (ECF Nos. 74, 75) to the Warden at the State Correctional Institution at Fayette, the state custodian failed to produce Gorby for the hearing. After being notified that the state custodian had failed to produce Gorby for the hearing, the court made arrangements for Gorby to attend the evidentiary hearing via videoconference.

### a. *Gorby waived his right to be physically present*

After consultation with his attorney, Gorby explicitly waived his right to appear in person. The court asked Gorby a number of questions and, being satisfied with his responses, made the finding that Gorby was fully competent, and that he knowingly and intelligently waived his right to be physically present at the hearing. HT 9/7/16 (ECF No. 79) at 6-7. Gorby's waiver did not adversely affect the decision on his habeas claims. This court was able to see and hear Gorby clearly, his own testimony was lucid, and Gorby was able to see and hear the person who was speaking at all times during the hearing. The courtroom was cleared prior to the commencement of the hearing and then again at the conclusion of the testimony of Daniel L. Chunko to afford Gorby an opportunity to consult privately with his counsel.

### b. *Trial counsel*

Chunko, Gorby's trial counsel, has been practicing law for over forty years. During the course of his career, he has held numerous positions, including prosecutor, juvenile prosecutor, and first assistant district attorney, and has worked with a number of law firms in private practice. He currently is a solicitor for the Washington County Children and Youth Services in Washington, Pennsylvania. HT 9/7/16 at 8.

Chunko testified that in March or April 1986, Gorby's mother, Betty Stevens, retained him to represent her son, Gorby.

During the course of the trial, Chunko cross-examined approximately twenty Commonwealth witnesses. Id. at 10. He tried to establish evidence that Gorby was drinking and was intoxicated on the night in question.

Chunko testified that the Commonwealth evidence was almost entirely circumstantial. The primary Commonwealth witness was Susan Loveland ("Loveland"), who testified that Gorby had admitted to her that he had killed the victim. Chunko testified he thought that "we could have won if Susan Loveland had not testified." Id. at 23. ("Without Susan Loveland, we had a 50-50 chance or better of prevailing on first-degree murder.") According to Chunko, prior to trial, Loveland had given a number of factually inconsistent statements, none of which inculpated Gorby. Chunko considered her an unreliable witness, as she had given approximately seven or eight statements in total, and "[t]hey were to some extent inconsistent factually." Id. at 34. He had interviewed her twice and both times she stated she would not testify against Gorby. Id. at 24. Chunko learned for the first time during trial that Susan Loveland was going to testify unfavorably towards his client. This came as a surprise to him because up until that point, it was his understanding that she would not testify. Id. at 30. Additionally, according to Chunko, prior to trial, Chunko was not aware that his client had confessed to her. Id. at 31.

Chunko testified that he did not seek a continuance of the trial after learning that Loveland had changed her testimony. When asked if anything prevented him from seeking a continuance at that point, Chunko replied:

> She was the last witness, other than Trooper Luppino, that the Commonwealth I believe had called, so we were already in the fourth day or fifth day of trial at that time. The answer is no. I mean, I could have requested a continuance, but realistically, knowing what she was going to testify then, I did my best to cross-examine her.

Id. at 27.

Chunko testified that at some point during the trial, Gorby admitted to him that he had killed Sphar. Chunko could not recall the exact date Gorby made the admission, but remembered that "we were in the trenches at the time the confession was made." Id. at 22. Although he could not recall specifically when the admission was made, he did recall that it "was right around the time [Susan Loveland] testified. It was probably at least the fourth or fifth day of trial," id. at 31, and "would have been at the cell we usually used to discuss the case at the Washington County Jail." Id. at 19.

Having heard the confession from Gorby, Chunko testified that he did not discuss with Gorby whether he would consider making the admission in a court of law because, according to Chunko, there was never an offer of anything less than capital punishment prior to the verdict. Id. at 20, 21. Chunko testified that prior to trial, he had a conversation with Gorby about the possibility of entering into a plea or allowing Chunko to go to the prosecution in pursuit of a life sentence as opposed to death. It was after this conversation with Gorby that Chunko learned from the assistant district attorney that the Commonwealth was not willing to offer any sort of a plea bargain. Id. at 20.

Chunko testified that his strategy throughout trial was "actual innocence." He recalled talking with Gorby about the strategy and that the two of them consulted during trial almost on a nightly basis. He testified that Bob Poland, the Warden of the Washington County Jail, provided them a particular room in which they could consult during the trial. Chunko testified that he talked to Gorby three to five times pre-trial, and that he would have also spoken to Gorby after he interviewed a number of witnesses during his pre-trial investigation. Chunko testified that Gorby was "on board" with the strategy, and if Gorby had objected to the defense, he would

have given Chunko his thoughts.  Chunko described Gorby's defense as being formulated and crafted by him, but discussed with Gorby. According to Chunko, he did not

> believe [Gorby] ever disagreed with it.  We talked about [the strategy] as extensively as I could to the extent of explaining to him what was going on, not only prior to the trial, but during the trial itself. . . . If [Gorby] had an objection, yes, he was more than free to [speak up]. . . He never objected.  He did give me his thoughts, though, and I appreciated his thoughts.

Id. at 25-26.

Chunko testified that he thought "actual innocence" was a viable defense until Loveland took the stand.  Id. at 18.  His goal was for a not guilty verdict; if he could have gotten a third degree verdict, that would have been a victory in light of all the circumstantial evidence and the testimony of Loveland.

Chunko testified that he understood the parameters of a diminished capacity defense and he knew that he would have needed expert testimony to support such a defense.  Chunko testified that if he had evidence of diminished capacity, like the expert testimony that was presented during the PCRA hearing, he would have argued both diminished capacity and reasonable doubt/ actual innocence to the jury.  Id. at 16.  Chunko conceded that he never considered seeking an extension of the trial so that he could obtain expert testimony to support a diminished capacity defense.

Chunko testified that he did not recall discussing with Gorby the possibility of a diminished capacity defense and did not have any reason at the time of trial to suspect that was a viable defense.  Chunko described his "investigation" as follows:

> We [Gorby and Chunko] had discussed a number of things.  Because I had asked him is there any information that you can give me – I think I testified previously that I did question his mother about that and her husband at the time, Mr. Gilbert Stevens, about that.  I tried to inquire from her what information she could give me about [Gorby] and his childhood and any other information.  Other than the

fact that I knew he drank a good bit and had a juvenile delinquency record as well. But as far as diminished capacity in other respects, I'm not sure we talked about that.

Id. at 32. Chunko testified that at the time of trial, he did not have any reason to suspect that diminished capacity factors may be present, but acknowledged, "[l]ooking in hindsight, sure, but at that time I don't believe that I did or I would have pursued it." Id. at 33.

        c.     *Gorby*

Gorby testified that he is currently confined at SCI-Fayette. He has "done every job that's just about available in prison," including law librarian, cook, and block cleaner. Id. at 38. Gorby has an eighth grade education. He testified that he had a limited understanding of what was going on at trial and was told to "sit at the desk and be quiet and let [Chunko] do what he needed to do . . . ." Id. at 49. According to Gorby, he was not told that Chunko was going to try to convince a jury that he was not guilty of the crime. Id.

Gorby recalled meeting Chunko sometime after his preliminary hearing, between May 10 and June 20, 1986, the date of his formal arraignment. He testified that he met with Chunko five times prior to trial. Gorby testified that he told Chunko "everything" about his background – that he "had been abused as a kid, you know, and basically where I ended up at, where I was at, drinking and drugs. It was nothing really specific." Id. at 39. Gorby told Chunko to contact his mother and she could confirm his background. Id.

Gorby testified that he confessed to the crime to Chunko as soon as he came on the case; that he never denied guilt to his attorney. Id. at 39-40. He testified that he confessed to Chunko while he was at the Washington County Jail:

I told him as much as I could recollect of the night in question. I did the crime, I mean, you know. I didn't invite Mr. Sphar out to kill him or rob him, but I had committed the crime of killing him.

Id. at 45. Gorby testified that the topic of his guilt came up with Chunko a couple of times prior to trial. Id. Gorby testified that he learned on August 29, 1986, that the District Attorney was seeking the death penalty.

He testified that he told Chunko before trial that he had confessed to Loveland that he had killed Sphar. Id. at 41.

According to Gorby, he was told by Chunko that he was "going for a third-degree homicide" and that his defense would be that he had committed the crime and was drunk and intoxicated on the night of the crime. Id. at 40-41. Gorby testified that at the time of trial had Chunko explained to him that it would be necessary for Gorby to admit guilt for a voluntary intoxication defense, he would have given permission for Chunko to pursue this defense, even if it put him at risk for a life sentence. Id. at 41, 42.

Gorby testified that Chunko never discussed with him the possibility of pursuing a diminished capacity defense; rather, Gorby was advised that because he was intoxicated and on drugs, "it would negate it down to third-degree homicide." Id. at 42. Gorby described his understanding of his defense as follows:

> It was just as simple as I thought that I had committed the crime, and because I was the way I was the night of the crime and couldn't remember most parts of it, that I was going to get third-degree homicide.

Id. at 42. Gorby testified that prior to trial, Chunko told him nothing about a diminished capacity due to mental defect defense. Had he been informed of this defense, Gorby would have given Chunko permission to pursue it, even if it put him at risk for a second-degree murder conviction and the risk of a life sentence. Id. at 42-43.

Completely contrary to Chunko's testimony, Gorby testified that on two occasions he "was called before the District Attorney's office" to negotiate a plea. Id. at 46. He recalled with "particularity" that the first meeting occurred on August 25, 1986, id., right before the District Attorney sent a letter saying he was pursuing the death penalty. Id. at 52. Gorby and his counsel met with First Assistant District Attorney Bill Johnson. Gorby was offered a plea deal in which in return for pleading guilty to third degree homicide and robbery, he would be sentenced to 20 – 40 years incarceration. On the advice of counsel, Gorby turned down this offer. On August 27, 1986, Gorby was again brought to the district attorney's office. This time, Chunko and he met with John C. Pettit, the district attorney of Washington County. He was offered a plea deal in which he would plead guilty to third degree homicide and robbery in exchange for being sentenced to 10 to 20 years for the murder and 8 to 16 years for robbery. Id. at 53. Again, on the advice of counsel, Gorby rejected the plea offer. Chunko explained to him that he was going to try to convince the jury that Gorby was responsible for third-degree murder. Id. at 47, 53. Gorby testified that, based on his conversations with Chunko, he thought that if the jury was convinced that Gorby was intoxicated at the time of the killing, he would get 10 to 20 years for third-degree murder. Id. at 48.

Gorby denied that he rejected the plea offers and chose to go to trial because he thought he could convince a jury that he was not guilty or that he was not willing to admit to the crime in a court of law.

# III.    Ineffective Assistance of Trial Counsel

A.    <u>Ineffective Assistance of Counsel Standards</u>

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defence."  U.S. Const. amend VI. The purpose of the right to the assistance of counsel is to ensure a fair trial, and "the Court has recognized that 'the right to counsel is the right to the effective assistance of counsel'." <u>Strickland</u>, 466 U.S. at 686 (quoting <u>McMann v. Richardson,</u> 397 U.S. 759, 771 n. 14 (1970)). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." <u>Id.</u> "The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." <u>Yarborough v. Gentry</u>, 540 U.S. 1, 8 (2003).

The United States Court of Appeals for the Third Circuit recently addressed the familiar <u>Strickland</u> framework in determining an ineffective assistance of counsel claim:

> [Petitioner] can demonstrate ineffective assistance of trial counsel only if he first demonstrates that his counsel's performance fell below an objective standard of reasonableness.  <u>Strickland</u>, 466 U.S. at 688, 104 S.Ct. at 2064. [Petitioner] also must determine that his trial counsel's deficient performance was prejudicial, such that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> at 694, 104 S.Ct. at 2068.  A "reasonable probability" means a probability "sufficient to undermine confidence in the outcome." <u>Id.</u>    Importantly, the Supreme Court has made clear that "there is no reason for a court deciding an ineffective assistance claim to . . . address both components of the inquiry if the defendant makes an insufficient showing on one" of the requisite prongs. <u>Id.</u> at 697, 104 S.Ct. at 2069.  Thus, unless there is a finding that counsel acted unreasonably, there is no need to consider whether there was prejudice that can be attributed to his representation. <u>Id.</u>

> With respect to the first <u>Strickland</u> prong, it  is well established that '"the Constitution guarantees criminal defendants only a fair trial and a competent

attorney. It does not insure that defense counsel will recognize and raise every conceivable constitutional claim."' United States v. Travillion, 759 F.3d 281, 289 (3d Cir. 2014) (quoting Engle v. Isaac, 456 U.S. 107, 134, 102 S.Ct. 1558, 1575 (1982)). On appeal, we "must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." Id. (citation and internal quotation marks omitted). In short, Strickland directs that "[j]udicial scrutiny of counsel's performance must be highly deferential" and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689, 104 S.Ct. at 2065.

Nguyen v. Attorney General of New Jersey, No. 15-3902, -- F.3d --, 2016 WL 4204796, at *6 (3d Cir. Aug. 10, 2016). The burden is on the petitioner to establish both Strickland prongs.

Under the first prong, Gorby must establish that counsel's performance was deficient. Strickland, 466 U.S. at 687. To do so, he must establish that "counsel's representation fell below an objective standard of reasonableness." Id. at 688. "The challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'" Harrington v. Richter, 562 U.S. 86, 104 (2011) (quoting Strickland, 466 U.S. at 687).

Under the second prong of Strickland, Gorby must establish prejudice. He "need not prove that the evidence would have been insufficient if not for counsel's errors . . . [or] 'that counsel's deficient conduct more likely than not altered the outcome'." Saranchak v. Secretary, Pa. Dept. of Corr., 802 F.3d 579, 588 (3d Cir. 2015) (quoting Strickland, 466 U.S. at 693). The issue is whether there is a reasonable probability of a different result. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. "That requires a 'substantial,' not just 'conceivable,' likelihood of a different result." Cullen v. Pinholster, 563 U.S.170, 189 (2011) (quoting Harrington, 562 U.S. at 112). "Further, the prejudice inquiry focuses on 'the effect the same evidence would have had on an unspecified,

objective factfinder' rather than a particular decisionmaker in the case." Saranchak, 802 F.3d at 588 (citation omitted).

B.     Diminished Capacity Defense

"The extremely limited defense of diminished capacity, which encompasses voluntary intoxication and mental defect, is only available to defendants who admit criminal culpability but contest the degree of culpability based upon an inability to formulate the specific intent to kill." Commonwealth v. Weiss, 81 A.3d 767, 796 (Pa. 2013) (citations omitted); see Commonwealth v. Padilla, 80 A.3d 1238, 1263 (Pa. 2013), cert. denied, Padilla v. Pennsylvania, -- U.S. ----, 134 S. Ct. 2725 (2014) ("[T]o prove diminished capacity due to voluntary intoxication, a defendant must show that he was overwhelmed to the point of losing his faculties and sensibilities."); Commonwealth v. King, 57 A.3d 607, 622 (Pa. 2012) (noting that "under this Court's prevailing precedent, [ ] a [defense of diminished capacity] to first-degree murder is only available to defendants who admit that they killed the victim, but contest the degree of guilty based on an inability, at the time of the offense, to formulate a specific intent to kill due to a mental defect or voluntary intoxication."). Further, "the authority to concede liability and to authorize the presentation of a diminished capacity defense rests solely with the accused." Commonwealth v. Hutchinson, 25 A.3d 277, 312 (Pa. 2011) (finding that a diminished capacity defense was not available to defendant because he "did not concede any liability in the killing of the victim. Rather [defendant] relied on an innocence defense, presenting an alibi witness, attempting to undermine the credibility of the child witnesses, and attempting to inculpate the victim's husband in her murder.").

Only expert mental health testimony that " 'speaks to mental disorders affecting the cognitive functions necessary to formulate specific intent' " is relevant to support the defense.

Commonwealth v. Terry, 521 A.2d 398, 404 (Pa. 1987) (quoting Commonwealth v. Weinstein, 451 A.2d 1344, 1347 (Pa. 1982)); Commonwealth v. McCullum, 738 A.2d 1007, 1009 (Pa. 1999); Commonwealth v. Legg, 711 A.2d 430, 444-45 (Pa. 1998).

C.     Trial Counsel's Performance was Deficient

To establish that his trial counsel was ineffective, Gorby must show that Chunko's performance was deficient. The magistrate judge concluded that Gorby had not met his burden to establish that Chunko's performance was deficient. After reviewing the submissions of the parties, and after considering the testimony presented at the September 7, 2016, evidentiary hearing, this court disagrees with that conclusion.

Gorby argues that Chunko was ineffective by failing to investigate, develop, and present a diminished capacity defense at the guilt phase of his trial. Gorby contends that his many cognitive and mental impairments are so severe that they would have established a diminished capacity defense at the guilt phase of his trial. Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable and strategic choices made after less than complete investigation are reasonable to the extent that reasonable professional judgments support the limitations on investigation. Strickland, 466 U.S. at 690-91. Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. Lewis v. Mazurkiewicz, 915 F.2d 106, 111 (3d Cir. 1990) (citing Strickland, 466 U.S. at 690-91). In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgment. Kimmelman v. Morrison, 477 U.S. 365, 384 (1986).

Defense counsel may properly rely on information supplied by the defendant in determining the nature and scope of the needed pretrial investigation. <u>Lewis</u>, 915 F.2d at 111. As the Supreme Court stated in <u>Strickland,</u>

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions. <u>See</u> <u>United States v. Decoster</u>, <u>supra</u>, at 372–373, 624 F.2d, at 209–210.

<u>Strickland,</u> 466 U.S. at 691.

The Pennsylvania Supreme Court aptly stated in finding that Chunko rendered deficient stewardship during the sentencing phase of Gorby's trial, that "the record amply demonstrates both that trial counsel inappropriately limited his investigation to the acquisition of rudimentary information from a narrow set of sources, and that the information that counsel did acquire through his limited efforts should have prompted additional investigation." <u>Gorby-III</u>, 909 A.2d at 790-91. This court finds that the same conclusion is true of Chunko's investigation for the guilt phase of Gorby's trial. Counsel had sufficient indicia of Gorby's history of drug and alcohol abuse as well as mental health problems to warrant further investigation; yet, he failed to conduct an investigation from which he could have presented evidence of diminished capacity.

The record reflects that trial counsel interviewed a number of fact witnesses regarding the night in question. However, at best, counsel conducted only a limited, rudimentary investigation

of Gorby's mental health and social history, which investigation consisted solely of talking with Gorby, his mother, and step-father. He did not request any mental health evaluations and he did not retain mental health experts to present available evidence of voluntary intoxication and diminished capacity to the jury. According to Chunko, he had no tactical or strategic reason for not investigating a diminished capacity defense. Id. at 95.

During the PCRA hearing held on January 19, 2000, Chunko testified that at the time of trial he had no knowledge of any mental health problems Gorby may have had. He testified that he had lengthy conversations with Gorby's mother and stepfather, that he questioned Gorby's mother a lot about her son, and that she told him "all she could about him." HT of PCRA Hearing, 1/19/00 (ECF No. 28) at 49. Counsel specifically testified that Gorby's mother "never indicated that he had a mental problem in her opinion. He was just a rough and tumble teenager." Id. at 64.

He testified that he knew that Gorby did extremely poor on standardized tests, received low scores on intelligence and achievement tests, and did poorly in school. Id. at 41, 65. Counsel also testified that he knew Gorby had been hospitalized for head trauma and that he knew Gorby had scars on his head. Id. at 53, 64. He testified that he asked Gorby's mother about the car accident Gorby had while he was a teenager and was not given any indication that the injuries Gorby sustained in the car accident had an impact on his mental health. Id. at 47 – 53.

Counsel testified that none of the discussions he had with Gorby or his mother and step-father gave him any reason to investigate further into the status of Gorby's mental health. Id. at 56 – 58.

Given the limited information trial counsel did know, it is difficult to comprehend why Chunko did not obtain educational records, medical records, or consult a mental health professional during his investigation and preparation for trial, especially when counsel knew this was a capital case and was aware of the volume of circumstantial evidence the Commonwealth would rely on in its case against Gorby. Other than his interview with Gorby's mother and step-father, counsel did not interview other family members to investigate Gorby's family life or background.

Moreover, Chunko did no investigation into Gorby's history of drug and alcohol abuse, any mental health issues, or his mental state at the time of the offense. During post-conviction proceedings, the mental health experts reviewed various records, witness statements, and tests results to evaluate Gorby's life history and mental state. They each confirmed that multiple factors in Gorby's life, including his cognitive deficiencies, head injuries, continued alcohol and drug use, intoxication on the night in question, and experiences as a child rendered Gorby incapable of forming a specific intent to commit first degree murder on the night of the crime. Chunko agreed during the evidentiary hearing on September 7, 2016, that mental health reports, such as the one given by Dr. Fox, would have been useful. NT 9/7/16 at 14. (ECF No. 79.)

Additionally, during the guilt phase of the trial, counsel elicited testimony that Gorby was a heavy drinker, was drinking heavily for hours before the offense, and appeared intoxicated. For example, during cross-examination, James Yeager, testified that he told Trooper John Luppino that Gorby was "drunk" and "intoxicated" on the night of December 20, 1985, and that Yeager regularly drank with Gorby. NT 9/12/86 at 299-300, 304. (ECF No. 22.)

Katherine Barnes, a bartender on the night in question at the Old Trails Inn, testified that Gorby was drinking Jack Daniels and Coke that night. Id. at 397. Another bartender at the Old

Trails Inn, Billie Joe Wrubleski, testified that, on the night of the offense, she made Gorby

"probably about four" whiskey and Cokes, that the other bartenders who were working also

served him, and that he was drinking whiskey and Coke the entire time he was at the Old Trails

Inn that night. Id. at 516-17.

Harold Richard Cain, a bartender at the Somerset Inn, testified that when Gorby entered

the bar that evening he ordered a Jack Daniels and Coke. Although in his statement to the police

Cain reported that Gorby appeared to have been drinking prior to coming in to the bar that

evening, id. at 464, at trial, he testified that Gorby did not appear to have been drinking prior to

coming in to the bar. Id. He also testified that he was familiar with Gorby's drinking habits and

he mixed Gorby's drink as soon as he saw Gorby come in to the bar. Id. at 472. Moreover,

police reports contained eyewitness accounts of Gorby's drinking and intoxication that day.

Yeager, in an 1997 affidavit, averred that he had given the police a statement which described

Gorby's use of alcohol and drugs and that Gorby's attorney never asked him about Gorby's

condition on the night of the murder:

> Jeff was drinking a lot that night and was very drunk. He may also have been on
> drugs. I had known Jeff for about three years and I knew him to do drugs every
> chance he got. He did a lot of pills and you could tell he was on something. Jeff
> had a reputation for doing a lot of drugs. . . I told the police everything I knew,
> including how drunk Jeff was that night. I gave them a statement which I signed.
> . . . Jeff's attorney never talked to me about Jeff's drinking, use of drugs, or his
> condition that night. If he had asked me I would have told him how drunk Jeff
> was.

Declaration-Affidavit of James Yeager. (ECF No. 18 at 32.)

At the PCRA hearing, Chunko testified that he knew Gorby was drinking heavily for

hours before the offense and appeared to be intoxicated at the time. NT 1/19/00 at 16-18, 24-27,

72. (ECF No. 28.) He testified he knew this information from police reports, from witnesses

who saw Gorby drinking before the offense, from Gorby himself, and from Gorby's mother and step-father.

Yet, the record clearly reflects that throughout the trial, Chunko presented only an actual innocence defense. Although he asked for an instruction on voluntary intoxication, he presented no evidence or argument that Gorby's intoxication prevented him from forming the specific intent to kill. Even with the testimony of Susan Loveland, and Gorby admitting his liability to him, trial counsel ended his closing argument as follows:

> What is the function of the jury? To find the truth, sift the wheat from the chaff, to look through the forest for the trees, to find the truth, to listen to the black and white, see the red and sort out the grey. What will you find? You will find, number one, Jeff Gorby did not kill Drayton Sphar. You will find out, number two, Jeff Gorby did not rob Drayton Sphar. What are you going to do with that when you find it? What other choice do you have? You must acquit him. Why? <u>Because he didn't do it, because he's innocent, because somebody else did it</u>. His life is in your hands. When you go back there, think hard and long to what each of you have to say. Thank you.

NT 9/17/86 at 1214. (ECF No. 27) (emphasis added).

The court also finds it unreasonable that counsel did not consider seeking a continuance of the trial to obtain expert opinions on Gorby's mental state, especially after his client conceded guilt to him or after finding out that Susan Loveland would testify that Gorby had admitted his guilt to her.

The court recognizes that Gorby's testimony was inconsistent about the terms of any plea negotiations with the District Attorney's office and what he was told by Chunko about his defense at trial. Despite this inconsistency, the record is crystal clear that Gorby was never advised by Chunko of the possibility of a diminished capacity defense.

Given Chunko's lack of investigation, the court concludes that Chunko's representation of Gorby was blatantly deficient at least with respect to his failure to investigate a diminished capacity defense.

D.   Gorby Was Prejudiced by Counsel's Deficient Performance

In addition to establishing that Chunko's performance was deficient, Gorby also must show that he was prejudiced by Chunko's performance.  Chunko testified during the September 7, 2016, hearing that had he investigated a diminished capacity defense and obtained the same evidence as that presented by counsel during the post-conviction hearings, he would have pursued a diminished capacity defense.  HT 9/7/16 at 14, 33.  Importantly, Gorby testified that he understood that a diminished capacity defense requires admitting guilt, and that had his trial counsel told him about this kind of defense,  he would have authorized his counsel to pursue it, even if such a defense put Gorby at risk for a second-degree murder conviction and a life sentence.  Id. at 43.  Gorby relied on his trial counsel's expertise, as was his Sixth Amendment right.  Had his attorney adequately investigated the available defense, Gorby would have made an informed decision to authorize his counsel to concede liability and pursue a diminished capacity defense in pursuant of a third degree murder conviction.

Respondents argue that Gorby has suffered no prejudice because at best, with a diminished capacity defense, Gorby would have been convicted of second degree murder, which would result in a mandatory sentence of life imprisonment.  Respondents further argue that:

> in order for this Court to find that trial counsel was ineffective, the Court must find that there is a _reasonable_ probability that the Petitioner would have been convicted of third degree murder, which does not carry an automatic life sentence.

Resp. Reply at 7. (ECF No. 60.)  During argument held on January 19, 2016, the court inquired about the possibility of a finding by a jury of a lesser offense.  Respondents' counsel responded:

27

Well, the possibility always exists, but I think you would have to accept that the jury would - - they would basically have to nullify second degree murder. Jury nullification, it's their burden to prove that there's a reasonable probability that the outcome of this trial would be different had this been pursued, had the diminished capacity been pursued.

It is our position to nullify second degree murder is not based on reason, that's not a reasonable probability. That's basically just an optimism. That's a guess, that's a hope that the jury would be swayed emotionally in some way to ignore what is I think very clear law in Pennsylvania, that if a killing occurs in the commission of a felony, such as robbery, then you are subjected to a mandatory life imprisonment.

HT 1/19/2016 (ECF No. 61) at 8-9.

The court finds this argument unavailing. It is not within the province of this court to conclude what a jury will actually decide as no court may remove from the jury its responsibility to decide the degree of culpability. Commonwealth v. McClendon, 385 A.2d 1337, 1340 (Pa. 1978) (it is the "exclusive province of the jury to determine the appropriate degree of guilt"); Commonwealth v. Leonhard, 485 A.2d 444, 446 (Pa. Super. 1984) (courts cannot "remove from the jury its responsibility to decide the degree of culpability"). In McClendon, the defendant was convicted of felony murder, arson, and related charges. The Pennsylvania Supreme Court held that the trial court worded the jury instructions in a biased manner so that the jury had no choice but to find defendant guilty of felony murder. In its original charge, the trial court stated that:

[I]f you find that the defendant committed arson and that arson was the cause of the death . . . he is guilty of murder of the second degree. If you find that the defendant is not guilty of arson or if you find that he was guilty of arson but arson was not a cause of the death of the decedent, you should consider the charges of third degree murder and voluntary manslaughter which I shall not define for you.

Id. at 1338-39. The Pennsylvania Supreme Court concluded that this charge informed the jury "that it should not consider third degree murder or voluntary manslaughter unless it found that appellant did not commit arson or that the arson, if committed, was not the cause of death. That

is not the law in this Commonwealth." <u>Id</u>. at 1339 (emphasis added).  The court opined that, "[t]he jury could have returned, pursuant to its mercy dispensing power or awareness of extenuating circumstances, verdicts of either voluntary manslaughter  or murder of the third degree even if it found  [defendant] guilty of arson, and found that the arson caused the victim's death." <u>Id</u>.  The court in <u>McClendon</u> reversed the judgment of sentence for murder of the second degree because it found that the trial court's charge infringed upon the exclusive province of the jury to determine the appropriate degree of guilt.

The Pennsylvania Supreme Court found that the evidence of Gorby's mental defects likely would have persuaded the jury away from a death sentence.  <u>Gorby-III</u>, 909 A.2d at 775. This court finds that Gorby established that it is equally as likely that a diminished capacity defense would have negated the Commonwealth's case for specific intent. Accordingly, this court cannot find that a jury, after considering the evidence related to the diminished capacity defense, <u>would</u> convict Gorby of second-degree murder; rather, the court finds that Gorby met his burden and established that had a diminished capacity defense been presented to the jury there is a reasonable probability that the result of the trial would have been different.

For these reasons, the court finds that Gorby is entitled to habeas relief based on his attorney's failure to investigate the potential diminished capacity defense.

### IV. Conclusion

For the foregoing reasons, the Court will sustain Gorby's objections to the R&R.  The court will grant the habeas petition and issue a conditional writ of habeas corpus obligating the

Commonwealth to either release Gorby or retry him within 120 days.[3]

An appropriate order will be entered.

BY THE COURT,


/s/ JOY FLOWERS CONTI

Dated:   September 28, 2016                    Joy Flowers Conti
                                              Chief United States District Judge




cc:    Samuel J. Angell
       Kimberly Newberry
       Federal Community Defender Office for the Eastern District of Pennsylvania
       (via ECF electronic notification)

       Jerome A. Moschetta
       Washington County District Attorney's Office
       (via ECF electronic notification)

---

[3]     When a Pennsylvania state trial court has granted a new trial and no appeal has been
perfected, the new trial shall commence within 120 days from the date on which the trial court's
order is filed.  Pa.R.Crim.P. 600(B)(4) (revised in 2012).  In exercising its discretion to set the
period of release or order a new trial, this court looks to the established state procedural rule.